The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Thomas M. Harris presiding. This case is 4-23-1542, Rockford Public Schools, District No. 205 v. Illinois Educational Labor Relations Board, et al. Good morning, folks. Apologize for the delayed start, but we have technical difficulties ironed out, I do believe. Before we begin with argument, first I'd like to have appearances from counsel, first for appellant. Good morning, Joseph Kulig on behalf of the appellant petitioner, Rockford Public Schools, District No. 205. Thank you. For Illinois Educational Labor Relations Board. Good morning, Laura Wunder, Assistant Attorney General on behalf of the Labor Relations Board. All right, and then for IEA, NEA. Good morning, my name is Colin Burns, Associate General Counsel for the IEA. All right, thank you. Mr. Kulig, you may proceed with your argument. Thank you, Your Honor. May it please the Court. The Board committed legal error when it used a brand new factor, the diversity of the existing bargaining unit, to negate traditional community of interest factors that weighed against certification of the unit in this case. Neither Section 7A nor the courts in this state recognize the unit, the existing unit's diversity as a factor relevant to the community of interest analysis, and there's a good reason for that. The diversity of the already existing bargaining unit says nothing about whether adding new employees to that unit will create one that is sufficiently cohesive to advance the interests of the collective bargaining process. As the Board acknowledged, in this case, there was no interchangeability and no common supervision between the field techs, the group that was seeking to be added to the group, and the existing RBMA bargaining unit. Therefore, in that case, those two factors should have, as a matter of law, weighed against certifying the proposed unit. The Board reasoned otherwise, however, because it looked at the positions within the RBMA unit and said that those positions were not interchangeable as a whole nor under common supervision. The Board did not cite any authority to justify its approach, and the Court here should not give credence to that approach by affirming the Board's decision. The question at issue was whether there was a community of interest between the field tech position on the one hand and the RBMA bargaining unit on the other hand. The relevant factors involved, by their very nature, look at the commonalities between the two groups. But differences among the employees within the already existing group or already existing bargaining unit, whose unit representation isn't even at issue, do not make the interest as a whole any more common with the group that is being sought to be added. In fact, it's counterintuitive to say that two groups have a community of interest because of all the differences that they have. Now, if the Board can use the within an existing bargaining unit, like the Board did here, to cancel out the same differences that are between the group that's looking to be added and the existing unit, then the community of interest standard that applies here is flipped on its head. Already diverse bargaining units will become more and more diverse based on minimal similarities between the members in that unit and the members in the group of employees that are being sought to add. As more and more different interests become represented in a single bargaining group, generally negotiation will become more difficult because you have more divergent interests represented in the same group and more interest that the group has to try to satisfy all at once in their negotiations. So, if the Board's approach here is affirmed and ALJs and Boards in the future decide to look to the diversity of the existing bargaining unit as a factor that can then cancel out differences between the group that's being added and the existing group, that impedes a collective bargaining process because it makes the negotiation of the process less efficient and undermines the whole goal of collective bargaining, which is efficient negotiation of common issues, and that hurts both parties or all parties involved, not only the employer but also the employees. The Board's mistakes, however, were not confined to its consideration of the interchangeability and the common supervision factors. The Board also relied upon manifestly erroneous factual findings when it found that the field techs and the RBMA employees come into close contact with each other. On this point, the Board made two erroneous findings. The first finding was that the field techs work closely with the RBMA employees when they install a SMART Board. Now, this was the only example in the record given during the evidentiary hearing of where, according to the RBMA, the RBMA and the field techs work together. In this scenario, several RBMA employees, in serial fashion, would do tasks to install a SMART Board, and then the field tech would come along and perform the last step, which was basically configuring the SMART Board and making sure it was plugged into the wall. But to work closely with somebody, there's a qualitative and a quantitative component. If you work closely with somebody, you're communicating with them about the task and you're communicating substantively about the task at hand, and you're also communicating with them with some sort of frequency. Here, the RBMA employees and the field techs in the SMART Board example never communicated about their tasks. The last RBMA employee in the line of RBMA employees who worked on the SMART Board, the low-voltage electrician, I believe, never handed off the task to the field tech. He or she never told the field tech, I'm done with my task. It's time for you to come in. The low-voltage electrician basically just left, and then it was up to someone else to inform the field tech that it's now your turn to come in to finish the job. That can in no way be seen as an example of working closely together. So isn't the issue before us, however, one where we have to conclude that how the Board viewed those interactions between these two classes of employees and the very example you gave was unreasonable? And if we don't find it unreasonable, aren't we supposed to give a deference? Well, it's a manifest way of the evidence standard, so you have to find that the opposite conclusion is evident or the conclusion that the Board made on the evidence was unreasonable or an inference made was unreasonable. I agree if you don't find that inference or the conclusion is unreasonable based on the evidence, then under the standard of review, you would uphold the finding of fact. We respectfully submit that based on this single interaction with the SMART Board, and especially the fact that there was no evidence that the installation of the SMART Boards was something that regularly or typically occurred. In fact, the Board at page 13 of their brief stated that for Sprecher, and Mr. Sprecher is one of the field techs who testified during the evidentiary hearing, a typical day would not include participating in installing a SMART Board. So you have two issues with the SMART Board example. You have, one, the fact that the party's involvement in the installation really involves no communication at all, and two, even if the installation was seen to have some sort of collaboration between the RBMA employees and the field techs, there's no evidence that these installations were occurring with any regularity. And so that was the first erroneous factual finding on the contact factor. The second erroneous factual finding was that there was a high degree of contact between the field techs and the RBMA employees because they all worked out at the various buildings in the district. And that was the only reason that the Board gave for this finding, was that all the out at among the district's buildings. And it's unreasonable to conclude that nine field techs, that's the number of field techs that were employed at this time, working among any of the district's 43 buildings among more than 4,000 employees, because they work in these buildings, necessarily run into the RBMA employees and let alone have a high degree of contact with them. And this is especially true because the evidence affirmatively established the opposite, that the field techs and the RBMA employees did not have a lot of contact with each other. May I interrupt you here for a moment? Assuming we agree with you that there wasn't a high degree of functional integration or contact among the employees, the Board also identified other factors in its decision. And one of them was that the two groups had common wages, that they had access to the same health insurance programs. And that a third factor was that a majority of the field techs favored representation by the union. Is that correct? That's correct, your honor. Okay, so why wouldn't that be enough? Because in light of all the other factors that we've been discussing, you know, wages is a factor that favors them. The access to insurance is something that is the same for all district employees. So, to the extent that weighs to certification, you know, it shouldn't weigh very much. And the desire of the employees, as you mentioned, but counterbalancing that is, one, the legal error committed by the board by entirely canceling out two factors that undisputably weigh against certification. The lack of common supervision and the interchangeability. Second, it's erroneous findings on the contact among the employees. So, those factors, we have the interchangeability, contact among employees, common supervision, and functional integration. All of those weigh against the community of interest finding. And then you add to that additional or additional aspects of the board's opinion that erred in addressing other factors. And those factors are the skills and functions and the working conditions factors. So, when you add all of those errors up against the factors that you identified, Justice Harris, our opinion is that it is clear error based on the entire record evidence to certify this unit. As I mentioned, in addition to the errors that I've already discussed, the board made errors in its treatment of the skills, functions, and working conditions factors. So, first, the board recognized that the skills and functions between the RBMA employees and the field techs varied. But then it didn't do anything else with this factor. And because of the significant differences between the skills and functions of these two employee groups, this was an error not to address this in any more detail. For the field techs, their skills and functions are directed to providing in-person technology services and support to individuals working on technology that, for the most part, is primarily aimed towards instructing the students. For example, a lot of their work deals with fixing or supporting the Chromebooks that the students use. And in fact, the RBMA president at the evidentiary hearing testified that the field tech support is being given to the individuals. As opposed to the physical infrastructure of the district. And that's what the skills and functions of the RBMA employees support. Their skills and functions are directed at supporting the physical infrastructure of the district and the vehicles as well. They're not involved in providing end-user support like the field techs. So, that's one big difference that the board identified, but it did not go into sufficient detail, especially for the significance of the differences. The second error was that the board did not recognize the differences between the education and experience requirements for the field techs and the RBMA employees. In terms of education, the field techs must have a high school degree and preferably an associate degree. In contrast, nearly a quarter of the RBMA employees, seven out of 30 positions, do not require a high school degree. And only one out of the 30, I believe it's a HVAC technician electrician, prefers an associate degree. So, there's quite a difference in the education required for the positions in both groups. In terms of experience, the field techs prefer two to three years of technology support experience and computing certification. And that differs from the RBMA employees. The RBMA employees have their own certification and experience requirements, but none of those requirements have to do with technology support experience or computing certification like the field techs. The third mistake that the board made in this context was in addressing the working conditions. Now, some of the working conditions, such as the access to insurance, just as Harris already mentioned, but the board didn't recognize, one, the difference in how the employees work. The field techs, for the most part, are expected to work autonomously and they prioritize the tasks that come in based on what they think is the best way to address them. They also align their hours with the hours of the school day. So, they work generally 730 to 4, and that's so that they can align their hours with the people that they interact with the most. And the people they interact with the most and have the most contact with are the principals, the teachers, and the office staff at the school buildings. So, that's why they work during the school day. In contrast, the RBMA employees, for the most part, they do work that is assigned to them based on what the foreperson gives to them. So, they have a lot less autonomy in the work that they're doing. And also, in terms of their hours, many of the RBMA employees start their shifts a couple of hours before the school day so that they can get some work done before the students and the teachers and the staff come in and they finish a little early or before the school day ends. And then also, some start their work day later in the work day around 11, so then their shift would end after the school day. And that's in contrast to the field techs who align their hours with the people who the students, the teachers, and the principals and staff who they interact with. So, at this point, unless there are any questions from your honors, I'd like to rest and save anything for rebuttal. Right. Thank you. You'll have time in rebuttal. Ms. Wunder, you may proceed with your argument. Thank you. I'd first like to give a bit of an overview and then address the points that council made here today. The standard of review, of course, is very deferential, the clear error standard, and I know that the court is familiar with that. I'd also like to talk a bit about the statutory guidelines. There are these several community of interest factors that the court considers in ways, and that is very much a case-by-case inquiry and particular considerations will have more or less importance depending on the context. And it should be kept in mind that the appropriateness test is not a stringent one. Under the relevant case law, a bargaining unit is appropriate unless under all of the circumstances it's artificial or arbitrary. So, it doesn't have to be the most important unit. There doesn't have to be maximal cohesion. It just has to be an appropriate unit. And the statute tells us what lens to use to look at the question of appropriateness. The factors are considered with the aim of ensuring that the employees have the fullest freedom in seeking the union representation that they choose. And it's for that reason that the desires of the employees, which is one of the statutory factors, is an important consideration. That's a factor that the board took into account here and gave significant weight to because eight of the nine field techs signed cards that they wanted to be part of the union. And there's no reason why on this record those employees' wishes have to be denied. Here, the field techs wanted to join the existing unit, which had 30 different job positions that involved various types of non-educational support services, many of which were hands-on services that involved installing or maintaining things. And the board weighed all the evidence. It noted some similarities and some differences. And it determined that the circumstances as a whole showed an already diverse unit that had a meaningful congruity with the proposed addition so that they shared a sufficient community of interest to be in the same bargaining unit. And that decision by the board was not clearly erroneous. And the district's contentions, to the contrary, come down to asking the court to re-weigh the evidence, which is not the court's role. A point that the district made in challenging the board's decision was that the board somehow erred by taking into account the diversity within the existing unit. And that, too, boils down to seeking to re-weigh the evidence. To start here, our consideration as a procedural matter, the district can't now contend that diversity within the existing unit is irrelevant because that's contrary to the exception that the district filed with the board. In the exception, the district acknowledged that diversity in the existing unit was an appropriate consideration. They went on to argue that the board was giving that consideration too much weight, but they acknowledged that, in principle, diversity within the existing unit was something that the board could take into account. And putting that, I would say that's a type of procedural default. Putting that aside, just taking a step back, it is hard to see how the board could fulfill its statutory role without considering the diversity within an existing unit. The board couldn't fully evaluate whether a particular job position should be included without looking at the entity that it would be included within. So this is a sensible and logical approach. There's nothing that counsels against the approach. The statute supports the approach because the statute contemplates that appropriateness is a fact-determinative inquiry and that particular considerations will vary from case to case. There was a board precedent for considering existing diversity. That's the Thornton Another problem here is that the district's contentions misdescribe what the board did. The district's asserting that because of the diversity, the board removed the common supervision and the interchangeability factors from consideration, that it just canceled out those factors. And that's not what the board did. The board did disregard those factors. It evaluated them in the context that was presented under the facts presented. And it found that those differences were less important when viewed in the context of the diversity here. And the board made a determination that adding the field text to the existing unit would not increase the diversity of interest among the employees. Weighing something is not disregarding something. So this was an appropriate exercise of the board's role in weighing the evidence that was presented. On this point, the district also contends that the board's decision invites large units with no cohesion. And that too is not persuasive. It doesn't show any error in the board's decision here because the board's decision, of course, was looking at particular facts before it and finding a community of interest in this case, not talking about what might happen in any other case in the future. And the district has protections for the concerns that it raises, which are that a bargaining unit can't be arbitrary or artificial. So that protects the district's interest. And the district is also overlooking the purpose of the statute, which is to allow the employees the fullest freedom to be represented as they choose. And again, as I've said, a unit need only be appropriate for bargaining purposes, not the most appropriate, not maximally cohesive. And the board would look at a situation based on the facts of any particular case. There may be circumstances where the diversity would be more important, a more important consideration, but here the board properly weighed the evidence. With that, I'd like to address the other contention that there were two findings by the board that were against the manifest weight of the evidence. Yes. Council before you move on. This is Justice Kavanaugh. I have a question with regard to you having mentioned Thornton Township for authority. Thornton Township is analogous factually, but you have any better authority for the idea that two factors basically were entitled to less weight than the diversity, given the diversity aspect. So my point is Thornton Township is simply similar on the facts, but in terms of those two factors having more weight, what's your best authority? Or pardon me, having less weight, those factors having less weight with regard to diversity, having more weight because our court sort of found that. The factors have, I would say that that comes from the board's role in the statute, which is to weigh all of the factors in a particular context. And if you're looking at whether two groups can be combined, you would look at what the one group is being combined into. But I don't know of a particular case that has occasion to specifically address that in great detail. I think it comes from the general principle that the board weighs all of the evidence before it, and it makes a determination based on the whole picture of that particular case. Okay, thank you. That was an artfully asked question, but it seems the answer is Thornton is your best authority, and that's based upon the similarities in the facts of the case. That was an occasion where the board did have, where the board was addressing diversity, yes. Thank you. On the manifest weight of the evidence, there is this suggestion that, well, the board said these two groups work closely together, and that is not against the manifest weight of the evidence, because what the district is not doing, they're limiting their observations to in-person contact. They're not looking at the nature of the work, and here the work itself had a close relationship, because the different job duties were all interdependent aspects of the same installation project. They were, there are multiple job positions that were needed for the project, so there was that interrelationship, and the board was looking at this from the perspective of the pieces that were needed to do a project, in terms of not necessarily that this would be in-person contact if everybody's standing in the same room at the same time. In terms of the high degree of contact, once again, the district is looking at this only in terms of in-person contact. The evidence was that these two groups provide services to each other and for the benefit of each other, and some of that contact in providing the mutual services would be in-person, and a substantial amount of it occurred through the work order systems, and the district doesn't acknowledge that as a type of interaction at all, so those findings were not against the manifest way of the evidence. Council also says, well, this didn't really happen frequently. There's no frequency requirement in the statute. Here, there were meaningful interactions, and these were recurring actions. With respect to the mutual provision of services, the field text use of the distribution employees, that did happen fairly frequently, and the other types of interactions in the providing of tech services to the union employees or the installation of smart boards, those were of a recurring nature, and they were part of the Well, what about these other factors? Wouldn't these other factors be enough to find a community of interest? And the answer is that they would be. Those were all significant factors, councils minimizing the commonality of wages or benefits, but the connections do not have to be unique ones, and from the employee's perspective, those matters are very important about pay and benefits. Councils also suggested that there were other errors in the board's decision, things that the board didn't look at or should have looked at more carefully, and I think it's important there to start by, those were all considerations that the board weighed. I think it's important to keep in mind the context of the board's decision. What the board was doing here was responding to and rejecting the district's specific exceptions. The board wasn't writing a whole entirely new decision and nothing required it to, so what the board did was consider and reject the exceptions. In the course of doing that, it adopted the ALJ's findings. It agreed with the ALJ that there was a sufficient community of interest here to be in the same bargaining unit, and it essentially determined that we're not seeing anything in these exceptions that would convince us otherwise, and it provides a bit of additional discussion in doing that, but the board did not need to go back and repeat everything that the ALJ had said in its decision, so the board, there's nothing inadequate about the decision here. The board considered the skills and functions, recognized that they were varied in some ways, and also recognized, and the ALJ gets into this more, that there is some similarities in that both use these types of work order systems that is all weighed and discussed. There are suggestions made that, well, the board didn't discuss the education and experience requirements. The ALJ observes that there's really no practical difference between those requirements. They're the same order of magnitude, so I see that I am about to be out of time. All of these factors were weighed and considered. Okay. Thank you, Ms. Wunder. Mr. Burns, you may present your argument. Thank you, and may it please the court. Ms. Wunder did a great job of covering a lot of the points that I was going to make. I don't want to unnecessarily repeat some of those arguments, but just to emphasize a few points that we are in agreement with. Basically, the premise of the negated or removed these factors, the lack of common supervision and the interchangeability, is just not supported. If you read the board opinion, it explicitly references both of those things, but when viewed in the context of determining community of interest, which necessarily and logically requires looking at the existing unit, it just weighed those factors less. To the extent that the district is asserting that these should have been given more weight, I would suggest that the act requires that they look at the factors that are listed or other factors that are appropriate on a case-by-case basis, and that no one factor is determined. No one or two factors is determined. In terms of that, there is case law on that. There is a case, Community College District No. 509, that's Elgin Community College. That was a 1996 case at 277 Illap 3rd, 114, the relevant part at page 122. That was a first district case from 1996. To emphasize those two factors would be inappropriate, and moreover, as a legal matter. Then as a factual matter, in this case, it would definitely be inappropriate in our view, because the existing unit does not have any homogeneity with respect to those two factors. There is no way that a new employee classification could ever be added if those two factors are dispositive, because there are 30 different classifications. They do not share supervisors. They are not interchangeable. There is everything from truck drivers to vehicle diverse job classifications in the current unit. It was appropriate, and it was ultimately quite reasonable for the Board to take that into consideration, because they have to view these factors in light of the surrounding circumstances that exist in the current unit. Also, with respect to some of the factual findings, Ms. Wunder mentioned them already, but the field techs and RBMA members, not only do they have functions serving one another in terms of certain specific projects, but they also, and there was testimony on this from Mr. Sprecher, who testified on behalf of the union, Mr. Phelps, who's the union president, and is familiar with all the classifications in it, and also the chief operations officer all testified that these job classifications trade work orders to each other. So to Ms. Wunder's point about the lack of in-person contact, that is the system that the district chooses to use through work order, ticket order systems. They might not be the same systems for RBMA employees or field techs, but nonetheless, they use each other's systems to request work from one another. For example, the Chromebooks, which is perhaps the most common function of field techs, those are often delivered by RBMA employees to the field techs through that work order system. So that's one example of the facts that underlie the findings of the board, that they have a high degree of contact in their functions, though perhaps not in-person, running into each other in a hallway, you know, semi-randomly, as was suggested. And I see that I'm out of time, so thank you. Okay, thank you, Mr. Burns. Mr. Kolek, rebuttal argument? Yes, Your Honor. I just want to make three points on rebuttal. First, the board raised an argument about procedural default as to the district's argument as to the improper use of the existing unit diversity. Our position is that the board never raised that in their responsive brief on appeal. And so, to the extent they're raising it for the first time now, you know, they have defaulted or waived their challenge to that themselves. Second, you know, I think you probably get into arguments of judicial estoppel as to whether you can change arguments. And the fact is, is that the district didn't win before the board or the ALJ, so there's no real concern about estoppel. Relatedly, the Thornton Township case that Justice Kavanaugh asked about, you know, I'll note that it seems that the ALJ cited a portion of that case where the Thornton Township board, the board in Thornton Township said, you can consider all the surrounding circumstances. And then the ALJ then extrapolated from that and said, well, the unit diversity is one of those circumstances. So, I don't, the district's view is that, you know, that broad language can't be used to create a new factor based on the unit diversity. The second point is that the board focused on the desires of the employees. That's a factor to be considered, but it shouldn't be given more importance or significance than any of the other factors. As the RBMA in the case they cited, the Elgin case, that says one factor should not be elevated in importance to the exclusion of other factors. So, that case itself says that no factor should be elevated above any others, and that includes the desire of the employees. The third and last point I want to make is regarding the RBMAs and the board's discussion of the work orders between field techs and the RBMA employees. The record doesn't show, the record shows that it's possible that these are made, but the record doesn't show that these were made every day, how many times they're made, how often they're made. But more importantly, the board and its decision didn't rely upon this aspect of the evidentiary record to support its finding. And it's a fundamental rule of administrative law that when you're reviewing an agency decision, like the board decision here, you have to look at what the board said in its opinion. And the fact that it incorporated ALJ's factual findings I think as a blanket at the very beginning, doesn't then provide evidence or analysis into its opinion that can later be relied upon. You have to look at the opinion itself, and you can't rely, the courts can't rely on post hoc rationalizations or arguments made by appellate counsel, which is what the RBMA and the board are doing here. So with that, I'd like to conclude my argument. Thank you. Okay. Thank you, counsel. Thank all of you for your arguments this morning. The case will be taken under advisement and a written decision will be issued.